UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 25-cr-10014-ADB |
| | * | |
| JENEL FLOUNOURY and JUSTIN FLOUNOURY, | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Currently before the Court are motions to suppress evidence seized pursuant to a state search warrant filed by Defendants Jenel Flounoury, [ECF No. 60], and Justin Flounoury, [ECF No. 61]. For the reasons set forth below, the motions are **DENIED**.

I.     BACKGROUND

    A.     **Basis for the Search Warrant**

The following facts are drawn from the affidavit of Massachusetts State Police Trooper Michael Traister ("Traister") submitted in support of the application for the search warrant, [ECF No. 60-1].

On Tuesday, September 24, 2024, at approximately 12:55 p.m., the Boston Police Department responded to a robbery at the Energy Credit Union at 156 Spring Street in Boston, Massachusetts. [ECF No. 60-1 ¶ 5]. The police spoke with the bank's Chief Financial Officer ("CFO") who had seen the alleged robber flee the bank. [Id.]. The CFO described the suspect as "a black male, approximately 5'8"–5'10", medium build, wearing a dark long sleeve sweater or jacket, dark pants, dark shoes with white soles, [a] blue baseball hat, blue surgical mask, dark sunglasses, [and] blue latex gloves, [and] using a silver crutch." [Id.]. FBI investigators arrived at the bank and interviewed the victim teller, Jenel Flounoury ("Jenel"). [Id. ¶ 6]. Jenel said that, at approximately 12:51 p.m., an "unidentified male" approached his teller window and demanded money, passing him a note that said, "Hand it over." [Id.]. Jenel read the note and immediately turned around and went through a closed door into a room that contained the bank's main vault, opened the top right vault, which was contained in the main vault, and retrieved approximately $197,146. [Id.]. He placed the money in a blue ATM bag, then left the vault and gave the bag to the suspect, who said, "Thank you, sir." [Id.]. Jenel described the suspect as "a light skinned black male in his forties approximately six feet fall, wearing a dark baseball cap, dark sunglasses, [a] blue surgical mask, blue latex gloves, [and] a black parker style jacket." [Id. ¶ 7].

Investigators also interviewed the Vice President of the bank and reviewed the bank's video surveillance footage. [ECF No. 60-1 ¶¶ 8–9]. The Vice President did not see the suspect

during the robbery, but she was extremely concerned about how and why the suspect was able to obtain such a large amount of cash. [Id. ¶ 8]. She said that the bank had received a large amount of cash from the bank's money carrier the preceding Friday, September 20, 2024, but that the majority of the cash was supposed to be locked "in the bottom right vault under dual control"; and she found it very suspicious that Jenel had stored approximately $200,000 in the top right vault, to which only he had access. [Id.].

The bank's video surveillance footage corroborated the CFO's and Jenel's accounts of what had happened: It showed a Black male wearing dark clothing, a blue surgical mask, a New England Patriots hat, dark sunglasses, and blue latex gloves and using a silver crutch enter the bank and pass Jenel a note, who then retrieved the cash from the vault, placed it into a bag, and handed it to the suspect. [ECF No. 60-1 ¶ 9]. When the investigators showed the CFO the footage, he said that Jenel's actions during the robbery were not consistent with tellers' training. [Id. ¶ 10]. Specifically, he said that, although tellers were trained to provide only the amount demanded, not more, Jenel did not look into his cash drawer but instead proceeded immediately to the vault, which the CFO found suspicious. [Id.]. Traister, who had worked on numerous robbery cases, [id. ¶ 1], also found it suspicious that, during an unarmed bank robbery, Jenel provided his own bag, went directly to the vault without being instructed to do so, and provided the suspect with a large amount of cash, [id. ¶ 11].

When Jenel left the bank for the day, the investigators followed him to his home at 30 East Ashland Street in Brockton, Massachusetts, where he arrived at 6:41 p.m. [ECF No. 60-1 ¶ 12]. Later that night, at 7:58 p.m., investigators observed two men, one of whom they identified as Jenel and the other of whom was later identified as Jenel's brother, Justin Flounoury ("Justin"), walk to the "side yard" next to the driveway outside 30 East Ashland Street, which

3

was at the corner of East Ashland Street and North Montello Street, and ignite a fire on a grill. [Id. ¶¶ 12–13]. The side yard was not fenced in and "was in plain view of the public." [Id. ¶ 13]. According to the affidavit, investigators "observed what appeared to be clothing inside the grill and the clothing began burning." [Id.]. At this point, the Brockton Police Department was notified and arrived on scene. [Id.]. When the Brockton police officers approached the two men and asked about the fire, the men said they were burning cardboard, but one officer "observed black clothing being burnt." [Id.]. The fire was then extinguished and investigators secured the residence "to prevent the further destruction of evidence."[1] [Id.].

Based on this information, Traister applied for a search warrant for the residence at 30 East Ashland Street and the adjacent curtilage. [ECF No. 60-1 ¶ 14]. A state judge authorized the warrant around 1:50 a.m. on September 25, 2024. See [ECF No. 2-3 ¶ 15]. During the ensuing search, the investigators recovered $160,275 in cash, including ten "bait bills" with serial numbers that matched bills that had been stored in the bank's vault, as well as blue surgical gloves, bank security plans, and a crutch. [Id. ¶ 16].

### B.  Procedural Background

Jenel and Justin were arrested on December 12, 2024, [ECF Nos. 3–4 (arrest warrants)]; see also [ECF No. 10 (initial appearance)], following the issuance of a sealed criminal complaint on December 6, 2024, [ECF No. 2]; [ECF No. 6 (granting motion to seal)]. On January 16, 2025, a federal grand jury indicted them for conspiracy to commit larceny from a credit union in violation of 18 U.S.C. § 371 and larceny from a credit union in violation of 18 U.S.C. § 2113(b). [ECF No. 21]. On November 7, 2025, the brothers each filed a motion to suppress, [ECF Nos.

---

[1] Investigators later removed and photographed black clothing from the grill. See [ECF No. 66 at 4 n.4, 5].

60, 61], which the government opposed on December 5, 2025, [ECF No. 66].[2]  The Court held a suppression hearing on January 8, 2026, at which FBI Agent Jason Kentros ("Kentros") testified and the parties presented additional evidence and argument.  [ECF No. 74].

## II.  DISCUSSION

Defendants argue that Traister's affidavit did not establish probable cause to search their home, arguing that (1) its allegations about Jenel's behavior during the robbery were unreliable, self-serving, and illogical; (2) the officers' observations of clothes burning in the grill should be excised from the affidavit because their intrusion onto the side yard violated the Fourth Amendment; and (3) the officers' observations about the contents of the grill were not reliable because it was dark.  [ECF No. 60].  The government responds that the totality of the circumstances detailed in the affidavit established probable cause for the search; the officers did not violate the Fourth Amendment as to observations that they made from the public street because the side yard was either not protected by the Fourth Amendment or the need to prevent the destruction of evidence justified the officers' intrusion into it; and the officers' observations from the public street were sufficient to establish probable cause, even without the evidence gained from the officers' intrusion into the side yard.  [ECF No. 66].

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  To comply with this constitutional requirement, "[a] warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense

---

[2] Justin filed a motion to join Jenel's memorandum in support of his motion to suppress, [ECF No. 62], which the Court granted, [ECF No. 63].  Accordingly, the Court treats the arguments made in Jenel's briefing, [ECF No. 60], as both defendants' arguments.

5

will be found at the place to be searched—the so-called 'nexus' element." United States v. Rodrigue, 560 F.3d 29, 32–33 (1st Cir. 2009) (quoting United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)).  "To satisfy the nexus element, the warrant application 'must give someone of "reasonable caution" reason to believe that evidence of a crime will be found at the place to be searched.'"  United States v. Faust, 853 F.3d 39, 46 (1st Cir. 2017) (quoting Ribeiro, 397 F.3d at 49)).  In other words, "a finding of probable cause is righteous when the totality of the circumstances create a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Adams, 971 F.3d 22, 31–32 (1st Cir. 2020) (citation modified).  This is "not a high bar," because it requires only "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'"  United States v. Sheehan, 70 F.4th 36, 44 (1st Cir. 2023) (first quoting Adams, 971 F.3d at 32, and then quoting Florida v. Harris, 568 U.S. 237, 244 (2013)); see also United States v. Gonzalez-Arias, 946 F.3d 17, 22 (1st Cir. 2019) (calling probable cause a "'nontechnical conception' that relies on 'common-sense conclusions about human behavior' and 'the factual and practical considerations of everyday life on which reasonable and prudent' people act" (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983))).

In evaluating whether a finding of probable cause is justified, courts consider "the totality of the circumstances as they are set forth in the warrant application and its accompanying affidavit," Sheehan, 70 F.4th at 44, and accord "considerable deference to reasonable inferences the [issuing judge] may have drawn from the attested facts," United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011) (quoting United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996)).  In a "doubtful or marginal case," they "defer to the issuing judge's probable cause determination."  Id. (quoting United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)).

"[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005).

Here, the warrant was supported by ample probable cause. The information contained in Traister's affidavit, viewed in the aggregate, created a fair probability that evidence of the September 24, 2024, robbery at the Energy Credit Union would be found inside Jenel's home at 30 East Ashland Street. Jenel had stored a large amount of money in a portion of the vault to which only he had access, contrary to the bank's usual practice, and his actions during the robbery—including immediately going to the vault and providing the suspect with a large amount of cash—were contrary to his training and struck both the bank's leadership and Traister, a seasoned investigator, as suspicious. When investigators observed Jenel burning what appeared to be clothing in a grill outside his home on the evening of the robbery, it was reasonable to believe that Jenel had been involved in the robbery and that evidence of the robbery would be found inside his home. Even assuming arguendo that the entry into the side yard by the Brockton police officers was impermissible and excising that information from the warrant, what remains in the affidavit was sufficient to establish probable cause.[3]

Defendants' arguments to the contrary do not change this straightforward conclusion. They attack the bank officials' statements as self-serving and Traister's suspicions as unreliable, arguing that Jenel's "overall actions" were consistent with "what almost any reasonable teller would do" in his situation. [ECF No. 60 at 9]. This strikes the Court as a stretch. The bank

---

[3] Although it is not necessary to resolve Defendants' arguments regarding the officers' entry into the side yard, the Court doubts that that entry violated the Fourth Amendment under the circumstances.

7

officials' statements regarding the storage of the money and, more importantly, Jenel's conduct during the robbery were corroborated by the video footage and confirmed by Traister, an officer with ample experience investigating bank robberies. Even if Defendants' explanation of Jenel's conduct as entirely innocent was reasonable—and the Court is not convinced that it is—it cannot be said that it was unreasonable for the issuing judge to draw the contrary inference. See Tiem Trinh, 665 F.3d 1 at 10.

Nor is the Court persuaded by Defendants' argument that the officers could not have seen what was in the grill when they first approached the yard next to 30 East Ashland Street, that is, before entering what Defendants claim was the curtilage of their home. At the suppression hearing, Kentros testified that, using binoculars, he had been able to see from the public street Jenel and Justin putting clothing in the grill and then using an accelerant to burn it—testimony corroborated by a text message sent by fellow officers at 8:01 p.m. ("1958 clothing to driveway and lighting on fire"), a photograph taken by Kentros at approximately 8:03 p.m., and a video taken by a fellow officer shortly thereafter. Although it is true that neither the photograph nor the video clearly shows what is being burned in the grill, and further that it was dark out and the officers were at some distance from the grill, the Court finds Kentros's testimony credible, especially considering the contemporaneous text message confirming his observations. At any rate, nothing in the warrant application provided any reason to doubt the reliability of the investigators' observations.

Finally, even assuming that the warrant application was not supported by probable cause, it was not "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." United States v. Leon, 468 U.S. 897, 923 (1984) (quoting Brown v. Illinois, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)). It provided robust grounds for

believing that evidence of the bank robbery would be found at the house of the teller who had acted suspiciously during the robbery and was seen burning clothing outside his house later that same day. It was thus "objectively reasonable" for the officers executing the warrant to rely on the issuing judge's probable-cause determination and on the technical sufficiency of the warrant. Id. at 922.

### III. CONCLUSION

For the reasons set forth above, Defendants' motions to suppress evidence obtained through the search of 30 East Ashland Street in Brockton, Massachusetts, [ECF Nos. 60, 61], are **DENIED**.

    **SO ORDERED.**

January 21, 2026                                                                           */s/ Allison D. Burroughs*
                                                                                         ALLISON D. BURROUGHS
                                                                                         U.S. DISTRICT JUDGE