|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | Crim. No. 25-cr-10014-ADB-2 |
| | ) | |
| JUSTIN FLOUNOURY | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SEVERANCE OF CODEFENDANT FOR TRIAL AND SUPPORTING MEMORANDUM OF LAW

The defendant, Justin Flounoury, moves this Court to sever his case from that of his codefendant, Jenel Flounoury, for trial. As grounds, Justin Flounoury asserts that severance is necessary because of the overwhelming prejudice that would result from a joint trial where he and his codefendant intend to present antagonistic and substantially incompatible defenses. Fed. R. Crim. P. 14(a); *United States v. DeCologero*, 530 F.3d 36, 52 (1st Cir. 2008).

### I.  Factual Background

Justin and Jenel Flounoury are each charged with conspiracy to commit larceny from a credit union and larceny from a credit union. The government accuses the brothers of stealing $197,146 from the Energy Credit Union bank in West Roxbury as part of an inside job robbery. Jenel worked at the bank as a teller. On September 24, 2024 at approximately 12:50pm, an individual entered the bank walking with a silver crutch and wearing a face mask, sunglasses, a dark jacket, and New England Patriots baseball cap. The individual approached the teller window where Jenel was working and handed him a note. The note read "Hand it over." After reading the note, Jenel went to the bank's main vault and placed all the money inside of it in an ATM bag. He returned to the counter and handed the bag to the robber, who turned and left the bank.

Investigators responded to the bank and interviewed Jenel. He described receiving the note from the robber and immediately going into a closed door that leads to the bank's main vault. He opened an inner vault and placed all the money in an ATM bag that he gave to the robber. The robber replied, "Thank you, sir" and left. He described the robber a light skinned black male in his 40s who was approximately six feet tall and wearing a dark cap, sunglasses, blue surgical mask, blue latex gloves, and a black jacket.

The investigators interviewed other bank employees. The bank's vice president voiced concern that the robber was given a large amount of cash and that the bank had just received the cash a few days earlier on September 20. The cash was supposed to be in the bottom right section of the vault, which required two employees to access it. Instead, it was in the top right section, which gave Jenel access to it without needing another employee to assist. The bank's chief financial officer also told investigators that tellers are trained to only provide the amount of money being demanded during a robbery and not to provide more. The chief financial officer considered it suspicious that Jenel did not look into his cash drawer and instead went straight into the vault when presented with the note.

Investigators conducted surveillance on Jenel when he left the bank later that day. They followed him back to his home in Brockton, where he arrived around 6:40pm. Shortly before 8:00pm, investigators observed Jenel and another man burning clothing in a lit grill outside of the home. The second man was identified as Jenel's brother, Justin. Law enforcement froze the residence until they were granted a search warrant later in the evening from a state court judge. Inside the home, investigators discovered $160,275 in cash, which included ten "bait bills." The "bait bills" matched the serial numbers recorded by Energy Credit Union of ten $100 bills that

were stored in the bank's vault before the robbery. Investigators also found blue surgical gloves, bank security plans, and a silver crutch throughout the residence.

Subsequent investigation purportedly linked Justin to the robbery. Justin's manager at Verizon stated that Justin left work early on September 24 to attend a doctor's appointment. Another Verizon employee said that Justin was walking with a silver crutch during the morning of September 24. A witness who stated that she was Justin's girlfriend told investigators that she picked him up from work around 11:00am to bring him to a doctor's appointment. She drove him to an area in West Roxbury less than a block from the bank. She stated that he got out and returned a short time later with a bag. She did not know what was inside the bag. Historical cell site information purportedly shows Justin's cell phone approximately 0.25 miles from the bank at 12:49pm on September 24 and returning to his home in Brockton at approximately 1:26pm.

The brothers were arrested and initially charged in state court relative to the robbery. In December 2024, they were charged in this court. Both defendants moved to suppress the items discovered during the search of the home, contending that the search warrant lacked probable cause. *See* ECF Nos. 60-62. The Court held a hearing on the motions to suppress on January 8, 2026, and subsequently issued an order denying them. *See* ECF No. 75. Both defendants have stated their intent to challenge the allegations at a jury trial. A joint trial is presently scheduled for August 3, 2026.

## II. <u>Legal Framework</u>

"If the joinder of offenses or defendants in an indictment … or a consolidation for trial appears to prejudice a defendant or the government, the court may … sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). In general, "[p]ersons who are indicted together should be tried together." *United States v. O'Bryant*, 998

F.2d 21, 25 (1st Cir. 1993). Notwithstanding this typical practice, severance is warranted where a joint trial will unduly prejudice a defendant. "The primary danger that [Rule 14(a)] seeks to avoid is a defendant faced with two prosecutors – the government and his codefendant." *United States v. Sherlock*, 962 F.2d 1349, 1363 (9th Cir. 1992) (citing *United States v. Lee*, 744 F.2d 1124, 1126 (5th Cir. 1984)). "[T]o compel severance on the theory that defenses are mutually antagonistic, the defense of one party, if believed, must *necessarily* indicate the guilt of the other party." *United States v. Stotts*, 792 F.2d 1318, 1321 (5th Cir. 1986) (emphasis in original); *see also United States v. Berkowitz*, 662 F.2d 1127, 1133 (5th Cir. 1981) (defenses must be "more than merely antagonistic – they must be antagonistic to the point of being mutually exclusive"). "In order to gain severance based on antagonistic defenses, the antagonism … must be such that if the jury believes one defendant, it is <u>compelled</u> to convict the other defendant." *United States v. Peña-Lora*, 225 F.3d 17, 33 (1st Cir. 2000) (emphasis in original). Put differently, "the tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." *United States v. Floyd*, 740 F.3d 22, 36 (1st Cir. 2014) (quoting *United States v. Yefsky*, 994 F.2d 885, 897 (1st Cir. 1993)). "Antagonistic defenses can require severance when they are truly irreconcilable, <u>or at least substantially incompatible</u>." *DeCologero*, 530 F.3d at 52 (emphasis added).

Joinder of defendants who intend to present antagonistic defenses can prejudice each defendant in several ways. First, "[d]efendants who accuse each other bring the effect of a second prosecutor into the case … In order to zealously represent his client, each codefendants' counsel must do everything possible to convict the other defendant." *United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991). Second, "[c]ross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant[.]" *Id.*

A joint trial may also unduly benefit the government; by accusing each other, "each claim individually acts to reinforce the government's case." *Id.*

### III. <u>Argument</u>

Justin Flounoury denies any involvement in the scheme to rob the Energy Credit Union and denies that he was the individual that entered the bank and took the money from his brother. He intends to go to trial and contest the government's claims that he participated in the conspiracy. His brother has also indicated his intent to go to trial. It stands to reason that Jenel Flounoury likewise denies participating in the robbery. Hence, both brothers deny any involvement in the crime. Such claims cannot logically coexist with one another.

Several indisputable facts in this case limit the nature of the defense that either defendant can advance. It is beyond dispute that (1) Jenel Flounoury was the bank teller that encountered the robber, (2) Jenel Flounoury gave the robber approximately $197,146 in U.S. currency from the bank's main vault, (3) $160,275 in U.S. currency was discovered in the brothers' home approximately 13 hours after the robbery, and (4) the money found in the apartment included several "bait bills" that matched the serial numbers recorded by the bank of bills that were stored in the vault before the robbery. Moreover, bundles of hundred-dollar bills in the apartment were held in wrappers marked "federal reserve." Neither defendant can reasonably dispute that cash taken from the bank earlier that day was found in their apartment that night. Thus, the best and likely only defense that either defendant can rely on is that the other committed robbery without their knowledge. Otherwise, the presence of the marked bills in their home is unexplainable.

Put simply, Jenel Flounoury's best defense is that Justin Flounoury or a third-party acting in concert with him was the robber and that he was uninvolved with and unaware of the conspiracy. Such a defense explains the presence of the marked bills in the home and would, if

accepted by the jury, exonerate him while condemning his brother. Conversely, Justin Flounoury's best defense is that Jenel Flounoury orchestrated and participated in the theft with a third-party who acted as the robber. Much like his brother's likely defense, if the jury accepts Justin's claims he will be acquitted and Jenel almost certainly convicted. This is not a case of "mere fingerpointing among codefendants" that would not normally rise to level warranting severance. *Peña-Lora*, 225 F.3d at 33. Instead, this is the quintessential case where "if the jury believes one defense, it is compelled to convict the other defendant." *United States v. Woods*, 210 F.3d 70, 79 (1st Cir. 2000). Severance should be granted in such a scenario.

The circumstances of this case are unlike many of those where the First Circuit has held that severance based on claims of antagonistic defenses was not warranted. For example, in *United States v. DeCologero*, three defendants in a RICO case asserted that they should have been severed from the fourth who acknowledged in his testimony being a drug dealer and doing business with the mob. 530 F.3d at 52-53. The other three defendants claimed that they had not been involved in any criminal activity. *Id.* at 53. The First Circuit affirmed, concluding that the defenses were neither irreconcilable nor substantially incompatible because "[the fourth defendant] did not implicate the others, nor did his defense as presented to the jury, if accepted, preclude acquittal of the others." *Id.* Conversely, here, both defendants will directly accuse the other of committing the offense without their involvement. The jury could not acquit one brother without convicting the other.

*United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990) is another useful contrast to this matter. There, the First Circuit affirmed the denial of severance despite acknowledging that the defendants' theories "did not always mesh perfectly" with each other. *Id.* 1195. Both defendants were implicated by statements on audio recordings. *Id.* One argued that the tapes were

unintelligible while the other asserted an innocent explanation for the conversations. *Id.* Though the latter's defense could have been accepted by the jury as implicating the former in some of the charged offenses, the argument did not compel the jury to convict. *Id.* Rather, the Court concluded that the jury could have concluded that one defendant's involvement was purely innocent and unrelated to the crimes while also finding that there was insufficient evidence to convict the other. *Id.* Again, such would not be the result in a joint trial of Justin and Jenel. No jury could accept both defenses and acquit both defendants where they each acknowledge that the crime occurred but contend that the other was the individual that committed it. The defenses are incompatible in every respect.

*United States v. Tootick*, the Ninth Circuit case cited above that outlined the myriads of ways that antagonistic defenses prejudice codefendants, is an apt comparison to this case. There, the defendants were tried in a joint trial with a stabbing that occurred after a party. 952 F.2d at 1080. Each defendant contended that the other was solely responsible for the assault. *Id.* at 1081. Beginning with the opening statements and extending through the closing arguments, both defendants assailed each other at every opportunity and vigorously contended that the other committed the stabbing. *Id.* at 1083-85. The Court noted that "[e]ach defense theory contradicted the other in such a way that the acquittal of one necessitates the conviction of the other." *Id.* Ultimately, the only party who was helped by their respective strategies was the government, who convincingly argued in closing that the jury should reject both defenses because it was logically impossible that both were true. *Id.* at 1085. Both defendants were convicted and both had their convictions vacated by the Ninth Circuit because of failure to sever. *Id.* at 1086.

A joint trial of the Flounoury brothers will inevitably lead to the same problem as in *Tootick*. The evidence supports that the bank was robbed and that at least one of them was

involved. Each will presumably take aim at the other and highlight the evidence tending to implicate the other in the robbery. Each brother's strategy necessitates that the jury convict the other to secure an acquittal. All the while, the government can reap the benefits of the brothers prosecuting each other and can simply argue that the jury cannot accept both defenses and should therefore convict both defendants. This prosecutorial approach proved successful in the joint trial in *Tootick*. It also supported reversing each defendants' convictions due to the overwhelming prejudicial effect.

Finally, there is a fundamental disagreement "over [a] core and basic fact[]" between the two defendants in this case. *See United States v. Paradis*, 802 F.2d 553, 561 (1st Cir. 1986). Critically, they disagree over the identity of the robber. Justin Flounoury anticipates that his codefendant will contend that he was the robber and pulled off the heist without Jenel knowing who he was giving the money to. Justin denies that he was the robber, denies that he was present in the bank, and denies that he played any role in the robbery that Jenel orchestrated. The prejudicial effect of the codefendants sparring over this central fact in the case is sufficient to justify severing them for trial.

### IV. <u>Conclusion</u>

For the foregoing reasons, Justin Flounoury moves that this motion be allowed and the Court sever his case for trial from that of his co-defendant, Jenel Flounoury.

<div style="margin-left:40%">

JUSTIN FLOUNOURY
By His Attorney,

*Daniel J. Gaudet*

Daniel J. Gaudet, B.B.O. # 688120
Carney, Gaudet & Carney
20 Park Plaza, Suite 614
Boston, MA 02116
617-933-0350
DGaudet@CarneyDefense.com

</div>

April 10, 2026

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on the above date.

*Daniel J. Gaudet*
Daniel J. Gaudet