UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| V. | ) | Crim. No. 25-cr-10014-ADB-2 |
| JUSTIN FLOUNOURY | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Prior to the events of this matter, Justin Flounoury had never been the defendant in a criminal case and had never seen the inside of a jail cell. Now, having pled guilty to the first and only criminal charge that he has ever had, Justin faces the prospect of a federal prison sentence because of his shortsighted, foolish behavior. He has accepted responsibility for conspiring with his brother to stage a robbery of a bank in West Roxbury to steal approximately $197,000. Justin's otherwise upstanding background, circumstances at the time of his arrest, and post-arrest efforts to put his life on a positive track merit a sentence of time served (10 days) followed by three years of supervised release. As part of his supervised release period, Justin, along with his brother, will be responsible for repaying $36,871 that was not recovered by law enforcement in the aftermath of the theft. This sentence is sufficient, but not greater than necessary, to comply with the purposes enunciated in 18 U.S.C. § 3553(a).

## I. Justin Flounoury's Background and Personal Characteristics

Justin was raised by a single mother, Monica, in the Dorchester neighborhood of Boston. He grew up alongside his older sister, Jeannica, and younger brother, Jenel. The four of them have always been exceptionally close; Justin and Jenel have lived together and with their mother for their entire lives. Monica worked as a mental health counselor and recovery specialist while Justin was growing up. Though Justin and his siblings always had a roof over their heads and

food on the dinner table, the family's financial situation was far from ideal. This was in part because Justin's father was never a regular presence in his life and contributed very little to his upbringing. Justin's father did not reside with the family, and he only saw him sporadically while growing up. Unfortunately, Justin has virtually no relationship with his father today. The last time he spoke with him was in 2022, and he is unaware where his father is living or what he is doing with his life. Justin regrets that he did not have a positive male role model in his life when he was younger and believes that the absence of his father took a toll on his wellbeing.

Justin and his family lived in Dorchester until he was eight years old. While he was fortunately sheltered from crime and violence, he was aware that it existed in the neighborhood. Justin's mother steered him towards sports to help keep him away from any trouble. When he was eight, Justin and his family relocated to Malden. The move was a positive change in his life; the area was quieter and more peaceful. They spent three years there before moving to Brockton, where the family has lived ever since. Justin continued to excel in athletics throughout his youth. He went to Brockton High School and was a member of the varsity football team, which was a highlight of his teenage years. Justin graduated from Brockton High in 2010.

Justin and his family moved into a three-story home at 30 East Ashland Street in Brockton in 2016. His older sister purchased the house, and the family was able to continue living together. Jeannica and her two children resided on the top floor with Justin, Jenel, and their mother on the second. It was a modest home in great need of significant upkeep. Justin and his brother each had a small bedroom, and their mother turned the living room into her own room. The kitchen doubled as the common area where the family spent time together and shared many meals. Sadly, the family experienced a house fire last August that displaced them from

their home. On August 3, 2026, a fire gutted the third floor and badly damaged the second floor where Justin lived as seen below:







Justin's bedroom and most of his belongings were ruined by the fire and water used to extinguish it. After the fire, Justin and his family temporarily relocated to a Residence Inn in Brockton. They lived in a hotel room up until last month when they moved into an apartment near the East Ashland home. Thankfully, the home was not a total loss and the family hopes that they will be able to move back next year if it can be salvaged. The third floor needs to be completely redone, and the second floor needs significant repairs. Justin and his family are in the midst of the long, painful process of rebuilding what was lost in the incident. They are grateful, however, that none of them were injured and that they may be able to return home in the future. For the time being, all of them, including Jeannica and her two children, are living in temporary housing.

Justin has always been an arduous worker. After completing some coursework at Benjamin Franklin Institute of Technology, he left school to help make money to support himself and his family. Many of his jobs have been in one form of retail or another. He has worked for Apple, Verizon, T-Mobile, and CVS. His current position is at an AT&T store in Brockton, where he has worked since December 2024. As discussed in greater detail below, Justin has excelled at his current job and is well regarded by his superiors. Despite being regularly employed since he finished school, getting ahead in life financially has always been a struggle for Justin and his family. None of his jobs have been lucrative. He has little in the way of savings and spends most of his money contributing to the household's financial needs and those of his two children.

Justin is the father of two sons. His oldest is 13 years old and is his son from a relationship that Justin was in during his late teens and early twenties. The relationship between Justin and his son's mother did not work out, which has strained his bond with his child. Justin and his son's mother are not on speaking terms. He rarely gets to see his son as a result and has

not spoken with him recently despite reaching out to do so. Justin is required to pay child support, which he does consistently and dutifully. Not having a relationship with his oldest son is painful for Justin. He knows how much he missed out on by not having his father around when he was growing up.

Justin will have another chance at raising a child after recently becoming a father for the second time. He and his current girlfriend had a son together who was born in August. Becoming a parent for the second time would be a major life development for anyone. For Justin, however, it came right on the heels of the fire that displaced him from his home and shortly after his guilty plea in this case. Nonetheless, Justin is embracing his second shot at fatherhood. His newborn lives on the North Shore with his mother but Justin sees him after he finishes work and on his days off. He helps care for his son and is excited to watch him grow. Justin and his girlfriend hope to be able to save enough money to move into a place of their own and raise their son together. Justin is committed to ensuring that he develops the kind of relationship with his son that his father never made with him.

At the time of the conduct to which he pled guilty, Justin was in his early 30s. His age at the time of this offense – his first and only – suggests that he poses a low risk to recidivate. It is well established that rates of recidivism decline as age increases. For those like Justin who are in criminal history category I when sentenced, the recidivism rates are likewise quite low.[1] Thus, the combination of his age at the time of the crime and his lack of prior criminal history strongly

---

[1] *See Recidivism Among Federal Offenders: A Comprehensive Overview*, United States Sentencing Commission (2016) at 19-23, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (last visited October 12, 2026). In this report, the Sentencing Commission found that for federal offenders who were between the ages of 31-35 when sentenced, the rearrest rate was 50.9%. This represents a marked decrease from the 71.1% rate for those younger than 21 and from 65.6% for those ages 21-25. Similarly, defendants who were in criminal history category I when sentenced recidivated at a rate of 33.8%, far and away the lowest rate of the six criminal history categories. By comparison, 54.3% of those in criminal history category II at the time of sentencing were rearrested. The recidivism rates, unsurprisingly, continue to rise with the criminal history category.

suggests that Justin is unlikely to be rearrested. This is bolstered by the fact that he has a supportive family, a stable history of employment, and positive long-term prospects and goals.

## II. Nature and Circumstances of the Offense

The events of this case can at best be described as ill-conceived and out of character for Justin. He is a true "zero-point offender," who has never been charged with a crime, let alone convicted of one, before this case. Despite never being involved in something like this before, he made the shortsighted, foolish decision to join his brother in staging a "robbery" of an Energy Credit Union bank in West Roxbury on September 24, 2024. This choice and his actions that followed have stained him with a felony conviction and jeopardized his liberty.

This case, like so many others, is rooted in Justin's financials struggles. Despite having a consistent history of employment throughout his life, Justin has never been financially secure. The same goes for the rest of his family to the point where they all lived in the same cramped, semi-rundown home. Justin also had significant responsibilities outside of himself and the family members he lives with; he pays several hundred dollars a month in child support to help care for his older son. When the opportunity presented itself for a fast financial windfall, he took it. This is in no way an excuse for his conduct. It does, however, offer context for why a young man with no prior criminal record would do something so reckless and foolhardy.

Justin and Jenel's plan was also far from sophisticated. Indeed, law enforcement unraveled the truth of the "robbery" within just a few hours of it happening. Justin's conduct is not emblematic of a hardened or even burgeoning criminal. Instead, it is that of someone who, for the first time in his life, transgressed across the boundary of lawful behavior and is unlikely to again cross that line.

Justin bears immense shame because of what he did. Though he did not threaten or intimidate any of the bank's employees while he posed as the robber, Justin appreciates that his actions likely caused them immense fear and concern. He also knows that law enforcement resources had to be expended on responding to the robbery and investigating the incident. Justin also deeply regrets the pain that he and his brother caused their mother and sister because of what they did. Justin's mother did her best to raise him on her own and guide him towards positive, healthy activities rather than those that often beset young men who grow up without fathers and with few resources. And, until he was nearly 33 years old, he lived a life that his mother could be proud of. His decision to help carry out the staged robbery of the Energy Credit Union has tarnished much of that good life he lived to that point. Now, anyone who types his name into Google will know of his crime.[2] A convicted felon is not the person that Justin's mother raised him to be, and he knows how badly he disappointed her. This is all the more painful because he faces the prospect of being incarcerated and being unable to be there to help support his mother like she has always done for him.

## III. Procedural History

Justin and his brother were arrested by state authorities on September 25, 2024. They were arraigned in the West Roxbury District Court the same day. Justin was detained on $10,000 bail and held at the Nashua Street Jail until October 3, 2024. This was the first and only time he was ever incarcerated. Two months later, on December 10, 2024, Justin and Jenel were again arrested, this time by the federal government. Justin was released on conditions at his initial

[2] *See e.g.*, https://www.universalhub.com/2026/two-brothers-plead-guilty-staging-robbery-west-roxbury-credit-union (Universal Hub, July 24, 2026); https://www.enterprisenews.com/story/news/crime/2026/08/04/brockton-brothers-jenel-justin-flounoury-robbery-energy-credit-union-west-roxbury/91168457007/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z113014p003050c003050e001810v113014&gca-ft=9&gca-ds=sophi (Enterprise News, August 4, 2026).

appearance, which included abstinence from controlled substances, random drug screens by the probation department, a mental health evaluation, and any recommended mental health treatment.

Ultimately, Justin entered into a Rule 11(c)(1)(B) plea agreement with the government and pled guilty to the conspiracy charge on July 24, 2026. Under the terms of the agreement, the parties agree that the total offense level is 12 based on the following calculations:

| | | |
|---|---|---|
| Base Offense Level: | 6 | § 2B1.1(a)(2) |
| Loss amount more than $150,000 | +10 | § 2B1.1(b)(1)(F) |
| Zero-point offender | -2 | § 4C1.1 |
| Acceptance of responsibility | -2 | § 3E1.1 |

Probation reached the same calculation in the presentence report. Coupled with a criminal history category of I, this produces a guideline sentencing range of 10-16 months. Because the applicable guideline range is in Zone C of the sentencing table, the Court may order a split sentence of incarceration and home confinement should it choose to impose a guideline sentence. The government has agreed to recommend a sentence within the guideline sentencing range and to dismiss the substantive larceny count upon completion of sentencing. Justin is free to recommend any lawful sentence. His time served recommendation represents a fairly modest, 10-month variance from the low end of the sentencing guidelines.

## IV. <u>Post-Arrest Conduct</u>

Since being charged federally, Justin has set himself on a course of self-improvement. Justin first started using marijuana when he was 18 years old. He was initially an occasional user, smoking once every few days up until he turned 21. At that point, and up until after his federal arrest, Justin smoked marijuana nearly every single day. Doing so took a toll on his mental health. In 2018, he suffered a mental health crisis where he began experiencing symptoms of psychosis and needed to be hospitalized. His mental health records reflect that the episode was

believed to be triggered by his marijuana use. Justin also acknowledges that he used marijuana as a means of coping with otherwise untreated depression. The conditions of his federal release prohibited Justin from using any illicit substances. This was initially a difficult transition given that he had consumed it every day for the previous twelve years. He struggled at first, testing positive for marijuana three times in the first four months of supervision. He was notified by probation that a fourth positive test would lead to Court notification. Justin knew that marijuana was having a negative impact on his life and continued use could jeopardize his freedom. He quit smoking at that point and has remained substance free ever since.

Justin was required to undergo a mental health evaluation as part of his pretrial conditions of release. After doing so, it was recommended that he participate in biweekly individual mental health counseling sessions. He did so beginning on February 6, 2025 until being successfully discharged upon completion of the program on January 30, 2026. This was the first time that Justin had ever undergone mental health counseling. He is grateful that he had the chance to learn more about himself and his mental health through counseling.

Justin has also excelled at work and been recognized for his diligence. After his arrest, Justin lost his job as a service technician with Verizon. Fortunately, he was able to secure work as a connectivity expert at an AT&T store near his home in Brockton. He typically works six days a week. Just last month, he was promoted to the store's manager. In this new role, Justin is responsible for managing a small team of sales reps, ensuring that sales goals are met, ordering supplies, organizing the floor layout, and following up with customers. Attached as Exhibit 1 to this motion is a letter from Justin's supervisor, Amanda Baldwin. Ms. Baldwin notes that Justin is "reliable, honest, hardworking, respectful and responsible." Moreover, despite the challenges of the last few months, including the house fire and birth of his son, Justin has continued to

perform exceptionally well and has never disappointed his coworkers. Finally, Ms. Baldwin comments that Justin's life has changed for the better and that he is doing well. That he has succeeded at work and found stability there speaks to Justin's capacity for positive change and growth going forward.

## V. <u>The Needs a Sentence Must Fulfill</u>

"Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012). The Court must conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id.* In reaching a decision on what constitutes an appropriate sentence, the Court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *Id.* 18 U.S.C. § 3553(a)(2) requires the Court to fashion a sentence that considers the four needs that a sentence must fulfill: punishment, deterrence, incapacitation, and rehabilitation. A sentence of time served followed by three years of supervised release achieves these goals.

The first purpose of sentencing is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A time served sentence is not a "slap on the wrist." Justin is now a convicted felon, the consequences of which will follow him for many years to come. For someone who struggled to obtain a high paying job, a felony

conviction could be a significant impediment for advancement in his career, notwithstanding the successes he has had in his current position. Justin also now knows what the inside of a jail looks like. He and his brother spent more than a week detained at the Nashua Street jail until their mother was able to post bail for them. For a first-time offender, who had never even been arrested before, this experience was significant for Justin. To that point, Justin also submits that he himself has been adequately deterred from further criminal conduct.

Finally, this proposed sentence will afford Justin further opportunities for rehabilitation. This process is already well underway given his efforts while on supervised release. Justin has hopes to go back to school or learn a trade. He recognizes that having a criminal conviction could make his life much more difficult in the years to come. Bettering himself through school or professional training is a worthwhile goal to help ensure that he continues on the positive path that he has been on during his release period. If Justin is placed on supervised release, he will be able to continue working to not only help provide for his family, but also to meet his financial obligations to the Court. He recognizes that part of this process is making everyone who lost money in this ordeal whole. He sincerely hopes he can do so as quickly as possible.

## VI. Conclusion

A sentence of time served followed by supervised release is an appropriate and just resolution to this case. Justin is a first-time offender who quickly learned that criminal conduct is not the way to a better life. Since this incident occurred over two years ago, he has charted a course towards a healthy, productive life. Regardless of the sentence imposed, he intends to continue moving in this direction. This proposed sentence will allow him to do without any unwarranted interruption brought on by incarceration. For the reasons stated throughout this memorandum, Justin urges the Court to adopt this sentencing recommendation.

JUSTIN FLOUNOURY
By His Attorney,

*Daniel J. Gaudet*

Daniel J. Gaudet, B.B.O. # 688120
Carney, Gaudet & Carney
20 Park Plaza, Suite 614
Boston, MA 02116
617-933-0350
DGaudet@CarneyDefense.com

October 13, 2026

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on the above date.

*Daniel J. Gaudet*

Daniel J. Gaudet